**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **BETHANY LAVOIE,** Plaintiff, | ) | |
| v. | ) | **Case No.** |
| **FHC, INC.,** Defendant. | ) | |

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Bethany Lavoie ("Plaintiff" or "Lavoie"), by and through undersigned counsel, hereby complains against Defendant FHC, Inc. as follows:

## INTRODUCTION

1. Defendant FHC, Inc. ("FHC") is a toxic and chaotic workplace with a longstanding pattern of poor management, bad business decisions, and conscious disregard for the law. FHC not only tolerates reckless and illegal treatment of employees but also disregards Federal Food and Drug Administration ("FDA") regulatory requirements as discussed below. Compounding the illegal conduct alleged in this action, FHC's own sworn statements in the Maine Human Rights Commission ("MHRC") phase of this case contained overt admissions with direct evidence of discrimination and retaliation.

2. This case arises under the Federal Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), the Maine the Family Medical Leave Requirements Law, 26 M.R.S. § 843 *et seq*. ("Maine FMLA"), the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12101 *et seq*., the Maine Whistleblower Protection Act, 26 M.R.S. § 831 *et seq*., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Maine Equal Pay Law ("MEPL"), 26 M.R.S. § 626-A and 628, *et seq*., and the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq*.

3. This case challenges FHC's:

A. Unlawful retaliation against Plaintiff for taking FMLA-protected leave;

B. Interference with Plaintiff's rights under the Maine FMLA;

C. Disability discrimination, failure to accommodate or engage in the interactive process, interference with disability benefits, admitted violations of confidentiality, and retaliation against Plaintiff under the ADA and MHRA for taking disability-related leave while working not only for Defendant but previous employers as well;

D. Whistleblower retaliation against Plaintiff for reporting a potential FDA violation, which led to her termination less than ten days later;

E. Sex-based discrimination, sex-stereotyping, and disparate treatment of Plaintiff in violation of Title VII and the MHRA; and

F. Unequal pay for substantially equal work based on gender in violation of the MEPL.

## THE PARTIES

4. Plaintiff Bethany Lavoie ("Lavoie") is an individual residing in the Town of Bowdoinham, County of Sagadahoc, and State of Maine.

5. Defendant FHC, Inc. ("FHC") is a global manufacturer of medical devices with headquarters and a principal place of business in Bowdoin, Maine. FHC manufactures devices, electrodes, and software for the neurosurgery industry.

6. Throughout Lavoie's employment and to the present, FHC has had more than 100 employees.

## JURISDICTION AND VENUE

7. Prior to filing this Complaint, Lavoie filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") on or about December 4, 2025.

8. Lavoie received a notice of right to sue letter from the MHRC on or about July 7, 2026.

9. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in Sagadahoc County.

## BACKGROUND FACTS

10. FHC hired Lavoie to work as its Marketing and Communications Manager effective September 25, 2023. Her starting salary was $85,000 per year.

11. Upon information and belief, FHC has approximately 80 employees in its Bowdoin location, and additional employees in locations such as Greenville, PA;

Bozeman, MT; Bucharest, Romania; Australia; and Medellin, Colombia. In total, FHC regularly employs more than 100 individuals.

12. Lavoie performed her job duties satisfactorily the entire time she worked for FHC and received a "Consistently Exceeds Expectations" performance evaluation.

13. According to statements it made before the MHRC, FHC "operates in a heavily regulated environment requiring close coordination among marketing, sales, quality, regulatory, and executive leadership."

14. On February 14, 2025, FHC gave Lavoie notice that her employment was being terminated as soon as she returned from protected FMLA leave, effective April 30, 2025.

15. In addition to interference with and retaliation for exercising her rights under the FMLA and Maine FMLA, FHC engaged in blatant whistleblower retaliation, disability, and sex-based discrimination for or the reasons that follow.

16. At all times herein relevant, the President of FHC was Melanie Cooper, who also served as the company's Human Resources (HR) representative for all but a brief period of time, when FHC hired a female HR representative who only lasted a few months in the position.

17. Upon information and belief, this HR representative had a very negative experience working for FHC in an HR capacity, because the company has a track record of blatantly disregarding the law and retaliating against anyone who opposes it.

18. When Lavoie began working for FHC, she reported to a female with the initials SF. At that time, Lavoie was running the entire marketing department, which was woefully understaffed with only two direct reports.

19. Lavoie's initial starting salary of $85,000 was low for industry standards and the scope of her responsibilities. Lavoie pointed out that the salary was low for the market compared to other positions in the same field. FHC therefore agreed that the company would reevaluate her salary shortly after she started. This renegotiation occurred about six months into the role.

20. Upon information and belief, and despite FHC agreeing at the time of hire that it would reevaluate Lavoie's salary short after she started, the company harbored sex-based discriminatory animus toward Lavoie for advocating for fair pay and raising the issue again.

21. FHC did not treat complaints about working conditions and pay from male employees with the same discriminatory animus as it treated Lavoie's very reasonable advocacy for more pay.

22. Before the MHRC, FHC misrepresented the reasons for Lavoie's increase in pay in 2024, falsely claiming that the pay increase was necessitated by Lavoie taking on more job responsibilities. In reality, Lavoie's job duties remained constant the entire duration of her employment, and all that changed in mid-2024 was her new job title – Global Marketing Manager.

23. Prior to Lavoie being hired to work at FHC, the company was a complete mess. Former CEO Fred Haer ("Haer") was suffering from dementia and had made a poor business decision to acquire a Bozeman, Montana company called NeuraLynx.

24. The NeuraLynx acquisition resulted in a financial nightmare. Getting NeuraLynx integrated into FHC's business operations proved chaotic and challenging in many ways, including how to handle the acquisition of underperforming NeuraLynx employees.

25. Haer officially retired in November of 2023 and became Chairman of FHC's Board of Directors. In his place, FHC hired a longtime employee from Romania named Cosmin Serban ("Serban") as the new CEO. Serban moved to Maine from Romania in November of 2023.

26. Before the MHRC, FHC submitted sworn statements under oath from Serban and Cooper, both of which contained gender stereotypes in an effort to fabricate reasons why the company terminated Lavoie's employment. Throughout these affidavits, FHC repeatedly accused Lavoie of "complaining" about other employees.

27. In reality, Lavoie observed from the moment she started working at FHC that the workforce was permeated with toxic behavior, fear of retaliation, inequities, and poor performance without any accountability.

28. As noted above, the female HR representative hired around the same time as Lavoie lasted only a couple of months before separating from the company. Upon information and belief, although FHC claimed before the MHRC that this HR

representative left due to a reduction in force, FHC terminated her in retaliation for doing her job in HR.

29. Before the above-referenced female HR representative left employment, she told Lavoie that the work environment at FHC was "the most fucked up thing I've ever experienced."

30. Early in her employment, Lavoie inherited as a direct report a male NeuraLynx employee with the initials AD. Due to his severe underperformance, FHC had decided at least twice to terminate AD's employment before Lavoie even began working for the company.

31. AD was also unhappy with FHC after it acquired NeuraLynx, and it was clear the employment relationship needed to end.

32. Upon information and belief that Lavoie learned while working at FHC, at one point the company paid AD (a man) at least $20,000 per year more than her even though AD reported to her. AD was one of Lavoie's direct reports in the marketing department and had similar job duties and a "marketing manager" title at one point while he reported to Lavoie, yet he earned more than her.

33. AD's training, education, background, and experience did not surpass or exceed Lavoie's, and there was no justifiable reason for the pay differential between them other than gender-based discrimination in violation of the MEPL.

34. Before the MHRC, FHC lied about the reasons for AD's separation from employment and tried to blame longstanding issues with AD's employment on Lavoie, even though they began before she even started with the company.

35. Because of his performance issues that predated her starting employment, FHC placed AD on a Performance Improvement Plan ("PIP") and then terminated his employment without even involving Lavoie in the process. FHC told the MHRC that AD had been laid off.

36. In a further display of gender bias before the MHRC, FHC portrayed Lavoie as a meddlesome female employee who "complained" too much, including about AD. However, AD's termination had been planned since before Lavoie even began working for the company.

37. FHC engaged in discriminatory sex-stereotyping in sworn statements presented to the MHRC when it came to other problematic employees as well, including those with the initials KR, BM, MP, EZ, BI, and CP. Each of these employees had longstanding issues with their performance, but FHC tried to portray its own mismanagement of employees as examples of Lavoie "complaining."

38. When it came to the employee with the initials KR, who also worked for NeuraLynx, everyone in the Maine office of FHC knew that KR needed to be fired. In fact, Serban flew to Montana to fire KR in person, but while there conducted a meeting with FHC President Melanie Cooper and Lavoie in which he said he had decided not to fire KR.

39. Contrary to the statements that Cooper made under oath before the MHRC, Cooper was shocked when Serban decided not to fire KR. Cooper looked at Lavoie during the meeting and said, "what the fuck?" because she agreed that KR should be, and the plan was that she would be, fired.

40. Cooper had very little control over the bad business decisions Serban was making, yet she retaliated against Lavoie – or carried out Serban's directive to retaliate against her – for making so-called "complaints," which amounted to protected activity under Maine law.

41. The international offices of FHC, which employed individuals with the initials EZ, BI, NH, and CP, had several employees who were known to be difficult to work with and demeaning toward women. In Latin America, EZ and NH were male employees who Cooper and Serban allowed to flagrantly disrespect and talk down to Lavoie. FHC then accused Lavoie of "complaining" if she said anything about EZ or NH's behavior.

42. In Lavoie's experience, Serban's approach to being presented with legitimate concerns about business operations or employee conduct was to suggest that Lavoie needed to "get over it."

43. In addition to gender-based discrimination, the misstatements FHC made under oath about Lavoie before the MHRC were made in retaliation for her filing a complaint of discrimination, in violation of Title VII, the ADA, the Maine Whistleblower Protection Act, and the MHRA.

44. Serban showed clear disrespect for women who did not agree with him, which upon information and belief is why Cooper often went along with anything he said, out of fear that she too would be retaliated against.

45. On one occasion, Lavoie and Serban were scheduled to attend a trade show in the fall of 2024. Lavoie received advanced permission from her direct

manager (SF) and Cooper to arrive at the trade show a day late, so she did not have to miss her child's first day of school. Serban treated Lavoie in a condescending and discriminatory manner about her need to arrive one day late at the trade show. He told Lavoie, "I always had to miss the first day of school."

46. The reasonable inference that Lavoie drew from her interactions with Serban was that he did not think it was acceptable for women to ever need time off for childcare reasons. However, Serban allowed a female employee who wanted to attend graduate school to work part time, disregard her job duties, and still receive full time pay. Serban's actions revealed a discriminatory animus toward women who request time off for reasons that are stereotypically female, like mothering.

47. Serban did not like when female employees disagreed with him or had differing opinions. This discriminatory and biased attitude toward women caused problems when Lavoie would express to Serban that his expectations of what FHC's marketing department could achieve were unrealistic.

48. Serban expressed that he wanted FHC's marketing department to function like it was Boston Scientific (a large competitor with over 50,000 employees), but the entire department consisted of Lavoie and two direct reports in marketing.

49. Toward the end of her employment, Lavoie engaged in protected activity under the MWPA related to one of FHC's LinkedIn posts.

50. Serban had demanded that Lavoie engage more with social media as part of her marketing responsibilities, but the constant chaos in the company created

by Serban himself left Lavoie very little time to accomplish this directive without more people on her team.

51. Lavoie agreed that she would focus on posting about new products, tradeshows, promotions, etc., whenever time allowed.

52. FHC is a regulatory-driven company and all statements made about the products the company manufactures need to comply with the FDA. FHC had a Regulatory Quality Officer with the initials KM, whose job was to review statements made about FHC product for regulatory compliance.

53. In mid-to-late January of 2025, a sales representative named Gabriel posted on LinkedIn about one of FHC's products but did not seek the approval of Lavoie or KM for regulatory compliance before he did so.

54. Gabriel made the post in his role as a sales representative because he wanted to drive sales without having to worry about regulatory compliance. He wrote in the post that the product "significantly cuts down on OR time," but the product had not been FDA approved for that purpose.

55. Gabriel made this non-compliant social media post despite sitting through a training a couple of months beforehand, in which KM instructed FHC employees, including sales employees, on the approval process required by FHC in order to abide by FDA rules and regulations.

56. On January 23, 2025, Lavoie took a screenshot of Gabriel's LinkedIn post and showed it to KM, the Regulatory Quality Officer. KM confirmed that the

post should not be on social media because the product had not been FDA approved for the purpose conveyed in the post.

57. KM agreed with Lavoie that the FDA could penalize FHC for making a false claim on social media in the company's upcoming FDA audit.

58. An important part of Lavoie's job, and one of her team's primary responsibilities, was to circulate approval of QSF-41 documentation for medical devices.

59. QSF-41 refers to an internal process that FHC and other FDA-regulated companies use as a review and sign-off for customer-facing medical devices. The purpose of FHC's QSF-41 process was to ensure compliance with global and national standards such as the FDA's Quality Management System Regulation (QMSR), or ISO 13485:2016.

60. FHC's internal review process involves filling out forms to verify that design controls are finalized, and risk management steps taken, to ensure that the product is safe for users.

61. FHC's QSF-41 internal review process also involves ensuring that product labels and user manuals have been verified and validated for clarity, safety warnings, and proper indications for use.

62. Because of the above-described process, KM had conducted a training for FHC's sales team describing the internal Regulatory Quality process, and why social media or any other kind of posts need to be reviewed prior to dissemination.

63. Gabriel flagrantly violated the process outlined in this training, putting FHC at risk. Before posting on LinkedIn that one of FHC's products cuts down on "OR time," Gabriel was supposed to send the post to marketing in advance for review by Lavoie as well as a product expert, and then KM as the Regulatory Quality Officer.

64. If Gabriel had followed the above required process before publishing the LinkedIn post that Lavoie reported on January 23, 2025, it would have been flagged as advertising something that was not FDA-approved, and the post would never have been allowed.

65. When KM saw the screenshot of the post that Lavoie showed her, she said it needed to be taken down immediately.

66. Lavoie knew that both Serban and Gabriel would be upset with her for blowing the whistle about this LinkedIn post, so she consulted with FHC President Melanie Cooper about next steps.

67. Lavoie feared retaliation by Serban because she had shared the screenshot of the non-compliant post with KM.

68. As expected, Serban was upset that Lavoie had blown the whistle about Gabriel's non-compliant LinkedIn post. Serban claimed that the LinkedIn post was not considered "labeling" under the FDA.

69. Despite Serban's retaliatory response, Cooper worked with KM to ensure the post was removed from LinkedIn. These events occurred right before an FDA audit, which would have involved reviewing FHC's social media content.

70. Furthermore, if any of the advertised products were sold during this timeframe, it could give rise to a False Claims Act complaint against FHC.

71. Serban liked Gabriel and showed him preferential treatment because he was a man. Both Serban and Gabriel behaved in an increasingly retaliatory manner toward Lavoie after she identified the regulatory concern.

72. On January 23, 2025, Lavoie wrote an email to President Cooper explaining that she hoped Serban was aware that the request to remove Gabriel's LinkedIn post "came from regulatory."

73. Lavoie's January 23, 2025 email to Cooper also indicated that it was "part of everyone's job at FHC to uphold the quality system, and this is a huge risk if our CEO is not going to support it."

74. Lavoie also informed Cooper that KM believed "we will get hit with this on an audit if it remains posted, as the auditor told her they check the website and social media prior to doing an audit. I hope he can come around to supporting our quality system or I fear we are going to get in trouble with the FDA."

75. Lavoie's January 23, 2025 email to Cooper also expressed fear of retaliation, stating: "As predicted, I knew this would come back on me."

76. Lavoie specifically told Cooper in the January 23, 2025 email that: "I did the right thing by bringing this to [KM]. I know you are just the messenger, but I am very discouraged with how this played out and will be taking a mental health day tomorrow."

77. Lavoie also informed Cooper in the January 23, 2025 email that she was overwhelmed with the situation, and "I cannot continue at this pace without additional resources."

78. The day after this email, January 24, 2025, was a Friday. Despite Lavoie putting Cooper on notice of her need to take protected leave under the FMLA or ADA on January 23, 2025, FHC did nothing to advise Lavoie of her rights and responsibilities to take protected leave that Friday, January 24, 2025.

79. Instead, according to their own admissions before the MHRC, Cooper and Serban immediately began a plan to terminate Lavoie's employment within days of her blowing the whistle on the non-compliant LinkedIn post discussed above.

80. By FHC's own sworn admission, the company decided to terminate Lavoie's employment on or about January 31, 2025 – another day that Lavoie was out for what she described as mental health reasons – without any designation or information from FHC about whether that leave was protected under the FMLA or ADA.

81. Lavoie worked several days the week of January 27, 2025, but took the mental health day on January 31, 2025 so she could go see her doctor.

82. Lavoie obtained a doctor's note on January 31, 2025 indicating she had been seen for an "acute medical concern," which was later identified as acute anxiety and panic due to her work environment. Lavoie's doctor recommended that she take short-term disability ("STD") leave starting on February 5, 2025 for 12 weeks.

83. Cooper was the person who received this protected, confidential information about Lavoie's need for leave, and she was also the person who participated in the decision to terminate Lavoie because by then FHC had no HR department.

84. Lavoie specifically asked if her STD leave could begin on February 5, 2025, so that she could set her team and the company up for success in her absence.

85. Lavoie saw her doctor on a Friday (January 31, 2025) while she was out for a mental health day. She informed Cooper on Monday, February 3, 2025 that her doctor had recommended a 12-week FMLA and STD leave of absence.

86. That same day, on February 3, 2025, Lavoie asked her doctor's office to complete and fax FMLA paperwork to FHC.

87. Before the MHRC, FHC submitted sworn statements claiming that it made the decision to terminate Lavoie's employment on January 31, 2025, but even on that day Lavoie was out due to disability-related reasons and getting a note from her doctor.

88. Lavoie's leave began on February 5, 2025.

89. On February 14, 2025, Cooper sent Lavoie a letter stating that even though she was out on FMLA leave beginning February 5, 2025, her employment was being terminated effective April 30, 2025.

90. Cooper's letter explained that the decision to terminate Lavoie while out on STD and FMLA leave was: "Based on your comments to other employees regarding your intent to look for other employment leading up to and during your leave, what

appears to be a pattern of leaving prior employment while out on leave, and conversations regarding whether this is the best fit for either party."

91. Cooper's reference to Lavoie looking for other employment while out on a medical leave is an admission that Cooper illegally violated Lavoie's confidentiality by talking to other employees of FHC about Lavoie's disability, and that Lavoie had a record of a disability.

92. Not only did Cooper violate confidentiality by discussing Lavoie's current leave with other FHC employees, Cooper also discussed with individuals whether Lavoie had a history of similar medical leaves taken during past employment.

93. Cooper doubled down on her admissions of illegality before the MHRC, constituting direct evidence of an ADA violation, when she swore under oath that: "I also became aware during the time that Ms. Lavoie had used prior medical leaves of absence with other employers to seek alternate employment. In fact, she had come to FHC at the end of a medical leave with another employer."

94. The above direct admission by Cooper constitutes evidence that she spoke to other individuals about Lavoie's need for leave, which is a direct violation of the ADA.

95. Although Cooper had no business discussing it with other employees, Lavoie does in fact suffer from a longstanding disability in the form of anxiety and panic attacks. This disability impacts multiple aspects of Lavoie's daily life and, at times, her ability to work, sleep, etc.

96. Throughout Lavoie's work history, she has occasionally needed to take medical leaves of absence when work stress has become overwhelming.

97. When Lavoie's anxiety is under good control, she has no problem working successfully.

98. Cooper also stated under oath that she herself noticed that Lavoie was becoming increasingly overwhelmed in her job at FHC, and Lavoie had told Cooper about having a crying episode at work.

99. Lavoie began having frequent panic attacks throughout 2024 and into early 2025 because of the toxic work environment at FHC.

100. Lavoie has always been able to perform the essential functions of her marketing roles, at times with reasonable accommodations and STD benefits afforded by her employers.

101. Because the work environment at FHC was so toxic and dysfunctional, other employees such as her friend and direct manager (SF) needed to take extended leaves of absence.

102. Upon information and belief, after SF returned from a three or four-month medical leave in January of 2024, FHC retaliated against her.

103. Not only did Cooper's February 14, 2025 letter admit that Lavoie was being terminated for having a recurring disability, it also admitted that FHC questioned whether Lavoie was a "good fit" for the company, which was a thinly veiled reference to her recent whistleblowing.

104. The February 14, 2025 letter said that Lavoie would be terminated effective April 30, 2025, without having any information from her doctor about whether there was an ongoing need for STD leave irrespective of her FMLA leave being exhausted.

105. FHC regarded Lavoie as disabled.

106. FHC failed to engage in the interactive process with Lavoie about the length of STD she would need, and any accommodations that would enable her to perform the essential functions of her job upon return.

107. FHC's violations of state and federal law alleged herein were undertaken willfully or knowingly.

**COUNT I – FMLA INTERFERENCE**
**(29 U.S.C. § 2615(a)(1))**

108. Plaintiff repeats the allegations contained in Paragraphs 1 through 107 as if fully stated herein.

109. As of January 31, 2025, Lavoie was eligible and qualified for leave under the FMLA.

110. Lavoie's anxiety and panic attacks constituted serious health conditions within the meaning of the FMLA.

111. Lavoie provided FHC with appropriate notice of her need to take a mental health day off from work on January 24, 2025, as well as on January 31, 2025.

112. On the very same day that Lavoie provided FHC with notice of her need to take a mental health day on January 31, 2025, FHC interfered with her right to

make a formal request for FMLA leave, and this interference occurred while Lavoie was at the doctor's obtaining a note asking for FMLA leave.

113. FHC interfered with Lavoie's substantive rights under the FMLA by denying, discouraging, or restraining her request for a full medical leave of absence that was communicated on February 3, 2025.

114. FHC further interfered with Lavoie's rights under the FMLA by firing her while she was out on FMLA leave.

115. FHC's actions would restrain any reasonable person working for FHC from requesting FMLA leave.

116. As a result of FHC's FMLA interference, Lavoie has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

117. FHC's violation of the FMLA was willful, justifying an award of liquidated damages.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT II – FMLA RETALIATION**
**(29 U.S.C. § 2615(a)(2))**

118. Plaintiff repeats the allegations contained in Paragraphs 1 through 117 above as if fully stated herein.

119. As set forth more fully above, Lavoie was eligible and qualified for FMLA leave due to her serious medical conditions, and she provided notice of needs to be out of the office for "mental health" days on January 24, 2025 and January 31, 2025.

120. Lavoie also made a formal request for a 12-week FMLA leave beginning on February 5, 2025, which FHC purported to approve but then fired her during such leave.

121. Lavoie's FMLA leave beginning on February 5, 2025 bore a direct temporal relationship and was the proximate cause of adverse action that FHC took against her.

122. FHC's actions in discussing Lavoie's need for FMLA and/or STD leave after she requested it amounted to another adverse action taken in retaliation for exercising her rights under the FMLA.

123. FHC's violation of the FMLA was willful, justifying an award of liquidated damages.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT III – VIOLATION OF THE MAINE FMLA**
**(26 M.R.S. § 847)**

124. Plaintiff repeats the allegations contained in Paragraphs 1 through 123 as if fully stated herein.

125. The Maine FMLA prohibits employers from discharging, disciplining, or in any other manner discriminating or retaliating against an employee for exercising any rights provided under the Maine FMLA.

126. For all of the reasons set forth in Counts I and II above, FHC violated the Maine FMLA by interfering with Plaintiff's rights to take protected FMLA leave.

127. For all of the reasons set forth in Counts I and II above, FHC violated the Maine FMLA by retaliating against Plaintiff for taking protected FMLA leave.

128. FHC's violation of the Maine FMLA was willful, justifying an award of liquidated damages under Maine law, including the $100 per day penalty provision.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation of the Maine FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT IV – DISABILITY DISCRIMINATION UNDER THE ADA**
**(42 U.S.C. § 12101 *et seq.*)**

129. Plaintiff repeats the allegations contained in Paragraphs 1 through 128 of the Complaint as if fully set forth herein.

130. At all times herein relevant, Lavoie was a qualified individual with a disability within the meaning of the ADA.

131. Lavoie's anxiety and panic attacks are longstanding serious medical conditions with a duration of longer than six months, which substantially impair her ability to work and perform other activities on an intermittent basis.

132. Lavoie has a record of a disability.

133. FHC has submitted sworn statements under oath to the MHRC admitting that Lavoie has a record of a disability.

134. FHC regarded Lavoie as having a disability.

135. FHC discriminated against Lavoie because of her perceived or actual disability.

136. FHC failed to accommodate Lavoie's disability by firing her before receiving any indication that her need for STD had concluded.

137. FHC failed to engage in the interactive process with Lavoie.

138. FHC violated the ADA's confidentiality provisions, as set forth above.

139. FHC engaged in unlawful disability discrimination against Lavoie in violation of the ADA.

140. FHC's stated reason for terminating Lavoie's employment was pretext for disability discrimination.

141. FHC retaliated against Lavoie because of her disability and need for STD leave, and its retaliation continued into the MHRC phase of this litigation.

142. FHC failed to provide Lavoie with all of the reasonable accommodations that were necessary for her disability in order to perform the essential functions of her job.

143. As a result of FHC's discriminatory actions and willful violations of the ADA, Lavoie has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain

and suffering and lost enjoyment of life, punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation of the ADA in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT V – WHISTLEBLOWER RETALIATION
## (26 M.R.S. § 831 *et seq.*)

144. Plaintiff repeats the allegations contained in Paragraphs 1 through 143 of the Complaint as if fully set forth herein.

145. The MHRA, by and through the Maine Whistleblower Protection Act ("MWPA"), prohibits discharging or taking adverse action against an employee for engaging in protected activity.

146. Lavoie engaged in protected activity within the meaning of the MWPA, in good faith, by complaining and making reports of illegal conduct, discrimination, retaliation, and violation of company policies that were illegal.

147. Even if Lavoie was incorrect in her belief that Gabriel's LinkedIn post violated FDA regulations, her belief was legitimately and reasonably held.

148. FHC took adverse action against Lavoie for engaging in protected activity on or about January 23, 2025.

149. FHC's adverse action bore both a casual and temporal relationship to the protected activity described herein.

150. Lavoie has suffered extreme emotional distress, along with economic damages, as a result of FHC's violation of the MWPA.

151. FHC retaliated against Lavoie under the MWPA either recklessly or intentionally, justifying an award of punitive damages.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation of the MWPA in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT VI – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII**
**(Disparate Treatment and Sex Stereotyping)**
**(42 U.S.C. § 2000e *et seq.*)**

152. Plaintiff repeats the allegations contained in Paragraphs 1 through 151 of her Complaint as if fully set forth herein.

153. Lavoie is female and a member of a protected class based on her sex.

154. Title VII makes it illegal for an employer to discriminate against an employee based on sex.

155. FHC's action described above amounted to sex-based discrimination and disparate treatment of Lavoie in violation of Title VII.

156. FHC engaged in sex stereotyping of Lavoie not only during her employment but in sworn statements submitted to the MHRC. Throughout Lavoie's employment and beyond, FHC treated the legitimate concerns she raised as though she were a meddlesome woman simply "complaining," which raises an inference of sex stereotyping.

157. Upon information and belief, FHC did not scrutinize or criticize the performance of male employees as harshly as Lavoie. The instances of disparate treatment compared to Lavoie include Gabriel, and other employees identified by initials above.

158. Upon information and belief, FHC also treated the male employee who took over Lavoie's job responsibilities after she left more favorable because of gender.

159. FHC does not engage in the kind of negative treatment or stereotyping of male employees the way it does with females but instead excuses bad behavior or nonperformance on the part of male employees.

160. As a result of FHC's discrimination and willful violation of Title VII, Lavoie has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT VII – DISCRIMINATION AND RETALIATION UNDER THE MHRA**
**(5 M.R.S. § 4571 *et seq.*)**

161. Plaintiff repeats the allegations contained in Paragraphs 1 through 159 of her Complaint as if fully set forth herein.

162. As described above, and alleged in Count IV above, FHC engaged in disability discrimination and retaliation against Lavoie within the meaning of not only the ADA but also the MHRA.

163. As described above, and alleged in Count VI above, FHC engaged in sex-based discrimination against Lavoie within the meaning of not only Title VII but also the MHRA.

164. As a result of FHC's retaliation and willful violations of the MHRA, Lavoie has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation(s) of the MHRA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT VIII – VIOLATION OF THE MAINE EQUAL PAY LAW**
**(26 M.R.S. § 626-A and 628)**

165. Plaintiff repeats the allegations contained in Paragraphs 1 through 164 of her Complaint as if fully set forth herein.

166. FHC failed to pay Lavoie equal pay for comparable work, in violation of the MEPL.

167. As a result of FHC's denial of equal pay, Lavoie has suffered and will continue to suffer damages, including but not limited to unpaid wages.

168. Because FHC's violation of the MEPL was willful, especially considering that Lavoie put FHC on notice that her pay was woefully inadequate for the role and responsibilities given to her, an award of liquidated damages is appropriate.

WHEREFORE, Plaintiff Bethany Lavoie requests that the Court award her damages for FHC's violation(s) of the MEPL, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**JURY TRIAL DEMAND**

Plaintiff Bethany Lavoie hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: October 5, 2026

*/s/ Laura H. White*

Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*

*/s/ Danielle Quinlan*

Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*dquinlan@whiteandquinlan.com*